JACOBS *v.* KNOX

4-6872                                        166 S. W. 2d 7

Opinion delivered November 30, 1942.

*Wade Kitchens,* for appellant.

*Jack Machen,* for appellee.

GRIFFIN SMITH, C. J. May 20, 1937, there was foreclosure of a mortgage executed in 1919 by Brooks Jacobs and his wife, Lilian.[1] The decree recites that default occurred October 1, 1933, and thereafter only $21.41 was paid, leaving a balance of $1,838.22. It was also contended that taxes were not paid after 1932, and that the land bank had expended $192.53 to protect its interests. Sale June 28, 1937, was to John G. Knox.[2]

There is testimony that Knox, after bidding the property in for $2,530 on Saturday, told the clerk of the chancery court he had the money and was ready to close the transaction. The clerk suggested that he return.

When Knox endeavored the following Monday to consummate his bid, he was met by a federal conciliator's intervention, filed by C. M. Martin, attorney for the Jacobs heirs. The chancery court thereupon ordered all proceedings stayed.[3] While jurisdiction of the state court was in suspense, pine timber on the 252 acres included in the mortgage was sold for $1,000, the amount being applied on the land bank's debt.

May 27, 1941, without notice to Knox, the commissioner's sale of 1937 was set aside. Knox intervened July 5, 1941, in consequence of which chancery court vacated its decree of May 27.

Bankruptcy proceedings were dismissed November 10, 1941, whereupon certified copy of the federal court order was filed in chancery court. Knox immediately left with the clerk the personal check of a third party. The Clerk testified he considered the check an equiva-

1—The mortgage was to secure $1,500 borrowed of St. Louis Federal Land Bank with interest at 5½ per cent. The obligation was amortized, semi-annual payments being $48.75, except the last payment, which was $48.70, due October 1, 1953.

2—These amounts were increased through interest charges, taxes, etc., that accumulated between filing of the complaint and rendition of the decree, in consequence of which judgment was for $2,044.25. Although the decree mentions notes drawing interest at 5½% per annum, and 8% after maturity, the judgment bears interest at five per cent. No explanation of this apparent discrepancy is made. However, it is unimportant in view of the fact that the decree from which this appeal comes is affirmed.

3—Action by the conciliator for Columbia County was under authority of the Frazier-Lemke Act.

lent of money, in view of the known responsibility and integrity of its maker, Joe K. Mahony.

November 29, 1941, the court heard argument on the question of confirming or vacating the sale of 1937. The decree recites that Knox was purchaser at a reasonable price; that no other person made a substantial bid, and found that the deed should be approved.

This appeal is from the order of confirmation.[4]

In dismissing the intervention filed with the conciliator, the federal court was of opinion that the administrator of the estate of Brooks Jacobs was not authorized under the Frazier-Lemke Act, or any other statute, to place the Jacobs estate in bankruptcy.

There was no appeal from the holding that the entire proceeding, which resulted in delaying confirmation of the sale more than four years, was illegal (perhaps "unlegal" would be a better word) for want of jurisdiction.

4—Contentions made on behalf of the heirs were: (1) Knox had failed to give bond to secure his bid. (2) The price, $2,530, was "insignificant, unfair, and unreasonable for the reason that the land, at the time, was worth $4,500 to $5,000." (3) Deposit by Knox of the check of a third person was not a compliance with the court order of 1937. (4) Timber was sold without Knox' consent, the amount having been paid to Federal Land Bank, and the debt balance did not at the time exceptions were filed exceed $1,750. (5) The lands in 1937 were worth $4,500 without considering minerals. Oil and gas leases "on the north and adjoining said lands" have brought from $10 to $25 per acre; west and adjoining the lands oil and gas leases have brought $25 per acre. Royalties are worth $15 per acre, and were of that value when Knox made his purchase. (6) Royalties in section ten, immediately north of the lands, are worth $15 per acre, "and much royalty in section ten has been sold for $15." (7) Seven large oil fields were discovered in Columbia county before and after the sale to Knox. The land had considerable mineral value as distinguished from the fee, and the foreclosure sale was made during a period of depression. (8) The Brooks heirs were "scattered," and it had been difficult to communicate with them and arrange to pay the Federal Land Bank debt. Petitioners had not had time to seek buyers who would offer a reasonable price for the land. Some of the appellants (petitioners below) had "arranged" for a buyer who would pay $350 more than the sum bid by Knox. (9) Confirmation would place Knox in position to sue for value of the timber, now alleged to be worth four times the amount it sold for. (10) When the federal court caused the land to be appraised in 1938 and its value was fixed at $4,400, consideration was not given to the worth of minerals. [Two of the appraisers testified the appraisement was made in February 1940.]

The result is that a valid bid was made by Knox in 1937. He was willing to pay, but could not do so because the clerk'thought Martin's petition on behalf of the heirs superseded state processes, and in consequence confirmation was defeated, and possession was withheld from the purchaser because of what was later found to be a mistaken belief upon the part of heirs that certain legal rights were available to them.

The sale was confirmed by a chancellor who has since died. His record on the bench is an enviable one. He was trusted, respected, beloved, honored—even revered—by those who knew him. Much testimony appears to have been given orally rather than by depositions. The Chancellor was familiar with transactions from initial steps in 1937 until the decree of confirmation was rendered in 1941. He had heard hundreds of cases involving land and mineral values in Columbia county. Based upon a record which does not show that the Jacobs tract sold for a sum inadequate in 1937, Judge Walker Smith thought substantial justice would be done by permitting the Knox bid to stand.

The question is, Did the court abuse its discretion? Our answer is that it did not. The transcript does not contain all of the record incident to Federal Land Bank's foreclosure procedure. According to the decree, minor heirs were represented by a guardian *ad litem,* while defense was made for them by an attorney *ad litem.* Heirs *sui juris* did not defend. It must be presumed, therefore, that the defense made for minors was because of legal necessity, the logical inference being that none of the defendants thought there was substantial equity in the property.

In *Martin* v. *Kelley et al.,* 190 Ark. 863, 81 S. W. 2d 933, it was held that in considering exceptions to confirmation in circumstances somewhat similar to those presented by the instant case, the pertinent inquiry should be whether, if the property should be resold within a reasonable time, it would bring a price substantially higher than the amount offered at the former sale; or, Is there

a prospective bidder who at resale will make a substantially higher offer?

While counsel for appellants stated, and no doubt honestly believed, that a better bid could be obtained, there is no testimony to this effect. But even if such testimony had been offered we would be unwilling to say the chancellor abused his discretion. Certainly there is no showing that the price proffered in 1937 was not reasonable. Following that offer the defendants for fifty-three months hindered Knox in his bid. If it be argued that they had a right to take advantage of the Frazier-Lemke Act, answer is that the federal court held the Act gave them no such right.

Affirmed.